Good morning. May it please the court, counsel. My name is Jennifer McCauley. I represent the appellant Mr. Momodu Babu Sesay. Mr. Sesay appeals from his sentence today. He pled guilty to conspiracy to commit bank fraud and entered into a cooperation agreement with the government. Pursuant to this agreement, he testified against his co-defendants, putting himself and his family in danger by doing so. After he testified, he took his wife on a trip to Florida, which was a violation of his pretrial release conditions. He was taken into custody as a result and was in pretrial custody prior to sentencing. So that was his punishment, his consequence for that pretrial release condition violation. On appeal, Mr. Sesay argues that the 63-month sentence imposed, albeit a departure from the guidelines, was greater than necessary on grounds that it failed to give adequate consideration to the significance of the substantial assistance he provided. I'll note from the outset that we are arguing on appeal that the district court did not depart far enough, and I understand that there's a slim chance that this court would reverse on appeal, but I would argue that this is such a circumstance where we should consider it. Do we have cases that say that's not even reviewable, the degree of a downward departure under the guidelines? We don't. The government had cited to Dalton, Dalton and its progeny were cases that deal with statutory minimums, and whether or not under Booker, the court could depart on 3553A grounds further after a departure under the guidelines, where there was... I understand that's not the issue, but your issue is there was a 5k motion, the judge only went down so far, he should have gone down further, right? That's your issue? Pretty much. So what happened was that the 5k motion... I thought we had cases saying that is not reviewable, the extent of a downward departure. We have cases that say it is a very rare, very rare consequence that this court would... If you have to show some kind of an improper factor, like some race or some other protected class... I think that there are cases that say when there are constitutional considerations like that, that that would be an exception, but there's no rule per se, case law rule or otherwise, that says that this court cannot consider this on appeal. It's just rare that this court would reverse and remand where there's already been a departure. Wouldn't you really at this point, if it were still something that we could review, that you would be compelled to show that at the end of the day, it's just substantively unreasonable that the downward departure based on the cooperation was not adequately taken into consideration, which is an exceptionally high burden. You know, if you think about where we've actually found the existence of substantive unreasonability, you know, it's almost sort of kind of shocks you when you look at those cases. And why is this case something like that? Why is this case so shocking? Well, we had substantial cooperation in this case, and the transcript so reflects by Mr. Cisse, and the government itself had asked for a deviation or a departure down to 55 months, which took into account the pre-trial release violation. So it seems the judge was more concerned about the pre-trial release violation than the other people in the room. And isn't that just sort of inherent in the nature of judging, is that, you have the discretion to kind of balance where those things fit? Absolutely, Your Honor. So the problem here is, in essence, the district court said, you know, I think if it weren't for the pre-trial release violation, we would actually be looking at the 36-month sentence that trial counsel was requesting. But Judge Montgomery held that because of this pre-trial release violation, I'm only going to depart to 63 months. So in effect, there was a 27-month sentence for the pre-trial release violation. And I mean, and this is what Judge Montgomery said on the record. So this isn't, this isn't, there's no extrapolation by counsel here on this point. This is exactly what she said. And 27 months for this pre-trial violation, which had already been punished by him being taken into custody earlier, and had already been taken into consideration in the government's request for 55 months. That's substantively unreasonable. And it doesn't fit, I am not aware of any other case where we have somebody taking their wife on an anniversary vacation to Florida and having to serve 27 additional months as a result. So now you're arguing substantive unreasonableness before you were arguing that the downward departure was not great enough. I think there's a legal distinction between reviewing a downward departure and because I said, I think it's got to be kind of akin to it because otherwise she can't possibly get by by the virtually unreviewable, absent, non-constitutional consideration that we've said in our previous cases, right? I mean, to get around that, you've got to have a theory. And I kind of gathered that theory was that it was sort of shocking the conscience unreasonable. And so I interpose that. I'm sorry if I created an issue for you. Well, no, I think you're helping in the is under 3553A, which is point two of your brief. It's just that you started out arguing about the extent of the departure. Yeah, I think that the better focus today would be on 3553A. But I did want to alert the court to the interplay of the different factors that the district court had was treating this as a 5K departure, but in effect was integrating these factors into it. Very well. Thank you for your argument. Mr. Bruder, we'll hear from you next. Good morning. Good morning. May it please the court. My name is Glenn Bruder. I represent the appellant, Saddam Saman Daud Saman in this matter. This appellant raises three challenges to his convictions for conspiracy to commit bank fraud and aggravated identity theft. He also seeks resentencing. And those particular challenges are laid out at some length in the brief I filed. Today, I'm going to focus on what I believe is the most significant of the issues guest registration records by a police officer pursuant to a Minnesota statute, which authorized or directed that hotels must give up their guest registration information to police on request. Does your argument rely almost entirely on the Patel case? That is certainly the closest case to this situation, Your Honor. I certainly cited a reply brief, which I think suggests that Patel is appropriately extended to this particular situation. So how can we, how do we get there? How do we extend Patel from the rights of the motel owner to the person who actually signs into the motel room? At least from my perspective, Your Honor, that's relatively easy. Fourth Amendment analysis focuses on privacy expectations, not necessarily on property interests. Certainly in Carpenter, the court, Supreme Court recently indicated that property interest is one component of determining whether there's an expectation of privacy, but only one component. The core analysis ever since Katz has been on whether there is a privacy expectation, which society is prepared to recognize. Patel focused in its decision on the litigants that were before it, which included the hotel proprietor. And the court said, this is, you know, this particular record is the property of the hotel proprietor. That doesn't foreclose extending Patel to other situations where there's a legitimate privacy expectation. And clearly- Well, do you really have a legitimate privacy expectation in a hotel register? If you think about it, you register at the hotel, the hotel adds you to their mailing list, they mail stuff to you, they sell their mailing list to other people, they contact you. I mean, does anyone really walk into a hotel and think that their identity is protected once they sign that register? I think that people walk into a hotel, Your Honor, with the legitimate expectation that that information isn't going to be subjected to government surveillance or snooping or spying. That's in effect what happened in Carpenter. The court indicated that, yes, the cell phone records and information was the property of the cell phone carrier. Carpenter had no proprietary interest in it. But the court recognized that he had a privacy expectation that the government wouldn't snoop into those aspects of his life. And that's no different than in a hotel. In fact, in Minnesota v. Olson, the Supreme Court indicated that when we stay somewhere outside our home, we have one of the highest levels of privacy expectations in that particular setting. In this case, was there some kind of an arrangement between the motel owner and the local police? There was certainly a government practice of making daily inspections of the Starlight Motel records. The motel acquiesced to that. I don't think they ever objected to it. I'm not sure if that would be called an arrangement or not. The police authority to request that information is conferred in, I believe, Minnesota statute section 327.27. And I don't know if the record reflects anything more than that, that it was a daily practice of the police. Which in this instance, I think makes it even more objectionable because this wasn't where the police were looking for specific individuals that they were suspected of committing crimes. They didn't have probable cause to believe that anyone in that hotel had done anything wrong. They simply wanted to make a daily inspection of its records. And so how does that, what you're sort of describing, I guess, as a sort of a fishing expedition, how does that affect an individual motel guest's expectation of privacy? Does that increase it or decrease it? I think it makes the conduct more offensive. I don't think it has any effect on the guest's expectation of privacy itself. When people check into a hotel or a motel, they expect a measure of privacy. They don't expect that the government's going to be intruding in their room. That's clearly constitutionally protected. They don't expect that the government's going to be snooping about their activities. Do you think they have an expectation of privacy in just their being there at all? Is that what you're positing? Yes, I do, Your Honor. And I think that's reflected, frankly, in the behavior of individuals who have great celebrity, who know that their privacy is jeopardized wherever they go. When they check in- They check in in their regular names? They do not. They check in under an assumed name. That's because they know that they have no expectation of privacy if they use their real name. Now, the government cited a whole string of cases here, US v. Miller, Couch against US, Smith against Maryland, McIntyre, Wheelock, involving situations where people gave information to a third party and the courts have held no expectation of privacy in what the third party does with the information. You didn't even mention them in your reply brief. Do you have any answer at all, or are you just giving up on that? I certainly do have an answer, Your Honor. The government's- Well, you should then address them in the reply brief. Well, I thought I did, Your Honor. The government's focus- You didn't even The government focuses on property interests rather than privacy expectations. Katz had no property interest in his telephone booth, and you and I have no property interest in our medical records, yet society recognizes them as private, and I'm out of time. Okay. Well, thank you for your argument. Thank you, Your Honor. Mr. Morrison, we'll hear from you. I thank you for appointing me to represent Mr. Sankan. It's a privilege to represent him. I want to address in my argument today the jury's issue in this case that was reflected in their question to the court about how they were to analyze the conspiracy. They asked the court, do we need to find that Mr. Cisse and Dean also conspired with Mr. Sankan and Mr. Saman, or did they have to just agree the two defendants sitting there at trial had conspired together? We, of course, answered the jury with, you have all the instructions. Well, the jury didn't have all the instructions. They didn't have the instruction that I had requested on multiple conspiracies. The government argues in their brief that it doesn't matter because there was sufficient evidence to show that there was just a single conspiracy in this case. I beg to differ with the government on that issue. I think it's clear in this case, and it's clear the jury struggled with this, that there were two conspiracies. There was the overarching Cisse conspiracy that Mr. Sankan was involved in, and that involved cutting checks, usually in the $2,000 to $3,000 range. At some point, Mr. Sankan drifts away from Mr. Cisse. It doesn't mean he gives up his check fraud activities, and instead he meets Mr. Saman and begins his own conspiracy with Mr. Saman. The reason why there's ample evidence in this record to show that these are two distinct conspiracies is because Mr. Cisse got on the stand, cooperating witness, doing everything he can to earn his departure, and candidly admits, I don't know Mr. Saman. I don't know anything about that. That's curious. If this were a combined conspiracy, you would think that Mr. Saman would know about the $50,000 checks, the big, big checks, double, triple, 10 times the amount that were typically being run through the Cisse conspiracy that Mr. Sankan and Mr. Saman were talking about. Instead, he knows nothing about it. But if your man never joined that large conspiracy, then why didn't the jury acquit, regardless of this other instruction? They were told they had to find beyond a reasonable doubt that your man joined the conspiracy, right? Why didn't they acquit? Because they didn't have just enough legal information, just enough law to explain to them that if there is two conspiracies, to answer their question that they asked the court, if there... Why isn't it enough law to say the government has proved beyond a reasonable doubt that your man joined the charged conspiracy, which you're calling the big conspiracy? Because conspiracy theory is not a simple idea. It is a complex idea. The courts continuously recognize that that conspiracy is a multifaceted. We have multiple elements. We have the scheme to defraud. We have the joining of the agreement. We have people coming in and out. And it's a complicated instruction. And if the court believed conspiracy was so simple, why do we even have a model jury instruction on multiple conspiracies? Sometimes when, as this court has recognized, when the facts suggest that there could be the possibility of two distinct conspiracies that the government is attempting to prove as one, the jury needs the benefit of that additional instruction talking about that distinction and giving the jury the tools to fully understand and be explained the possibilities of multiple conspiracies. So in this case, as to your client, what was the specific harm that resulted? Was it a spillover effect? What was the consequence? One, I think there's a variance of the evidence. And I don't think it's fair for a jury to hear evidence about two conspiracies and be able to just mash it all together. But one of the bigger harms for specific evidence for Mr. Sajonkin was the second conspiracy had a wide-ranging set of jailhouse recorded conversations where essentially my client is discussing on audio recordings that were played to the jury how the conspiracy and how the check fraud conspiracy went down. And so it gives a quality to the evidence against my client that if this were two conspiracies and had been treated properly, the jury wouldn't have heard and the evidence wouldn't have been... How would the jury instruction result in that evidence being excluded? It was at least would give me an opportunity to argue that you need to compartmentalize that information and that you can't attribute it and understand when you're talking about the check fraud on one side, how you can't just take that and assume that that's exactly what was happening on the other side. I couldn't argue that. I did argue that. I did argue that. I certainly argued to, in all candidness, I argued to the jury that this was a two conspiracy. Judge Montgomery said that you could, right? She said it wasn't going to give the instruction. You're free to make the argument. And at the end of the day, you made the argument. How did the language of the question reflect a confusion on the multiple conspiracies? Can you just... Do we need to determine if the defendant conspired with CSA and Dean in order to convict on count one or just agree if the two defendants conspired together outside of any connections with others who may have conspired? Clearly, they're recognizing the potential of two separate conspiracies here. My time's up. So when the judge referred them back to the instructions, then didn't that tell them that they had defined that your man conspired with the first two people in the main conspiracy, the charge conspiracy? I don't think it answered. Obviously, the initial jury instructions didn't answer the jury's question to begin with. Otherwise, they wouldn't have raised this question. And so it shunted them back to the position that we always put jurors in when they ask questions and tell them you've got everything is they have to guess then at the meaning of the law. And a jury shouldn't be guessing about the meaning of the law. They should be properly instructed. And in this case, they weren't. Thank you. All right. Thank you, Mr. Morrison. Ms. Brennan, we'll hear from you. Thank you, Your Honor. Good morning. Good morning, counsel. My name is Amber Brennan. I represent the United States. I also was counsel at the trial court level and represented the United States during the investigation and trial and sentencing proceedings below. I think what I wanted to focus on this morning is the conspiracy issue that was raised both by Mr. Sajonkan and Mr. Saman in their briefs and obviously just now argued by Mr. Sajonkan. We have a fundamental disagreement about what the evidence was in this case. And there was clearly no evidence that would allow the court to have given a multiple conspiracies instruction. The only thing that the defendants hang their hats on in terms of arguing that there were possibly two conspiracies is the fact that the government didn't prove that Mr. Saman and Mr. Sajonkan sat together and talked to each other and knew each other. I mean, that's basically what they're arguing. Well, I think it's really a little bit different than that. I think that they see that, in fact, there may be a claim of some type of a real conspiracy. But what they're really arguing is the spokes just aren't connected, that what there really looks like is there's players that are in different conspiracies, but they are, in fact, different conspiracies with different objects, different ends, different participants, and that you can't really say that this is a case that there's enough evidence that the jury ought to intuit that the wheel's completed, right? Isn't that their claim? Yes, Your Honor, but if we look at, well, one of the things that the defendants do is they don't address some of the most powerful evidence that does connect all these individuals. Is that documentary evidence? Yes. And did we have access to that? Did that remain under seal? Because I noted that you had listed some documentary evidence, and I wasn't able to get at it to see what it is. So, if you could help us understand what that is that you think is so strong that links the two. Sure, Your Honor. Also, if for some reason they didn't submit the whole record, why don't you submit the whole record or check into that, please? I will, Your Honor. My understanding is that we did submit the exhibits that we cited, but... Submitted them to whom? The court. The Eighth Circuit? Yes, the ones that we cited in our brief. We'll check it. Those should have been submitted to the court. I will double check on that, but... All right. So, the easiest way to do part of this is to turn to page 15 of my brief, because it lists specific checks, and that's very... It's the most probative evidence we have. So, if you look at... I don't think anyone's disputing that Mr. Cisse and Mr. Sajonkan started doing checks together back in 2009. Mr. Sajonkan doesn't dispute that he was involved with Cisse in checks. Fast forward to 2011, and now no one disputes either that Mr. Sajonkan now has hooked up with Mr. Saman, who's in jail, and they're on these recorded jail calls talking about doing checks, right? Everyone agrees, and that supposedly is the two different conspiracies. But if you look at what Mr. Saman actually did once he got out of jail... He gets out of jail in March of 2012, okay? One of the things that Mr. Saman did before he got out of jail, he met Kevin Fitzgerald, who actually had a real job and a retirement account before he got a bunch of DWIs and landed in jail with Mr. Saman. Kevin Fitzgerald gave Mr. Saman his paycheck from this Visy Inc. and a copy of his retirement statement that was held by... The account was held by BNY Mellon. Nobody disputes those accounts. The Visy Inc. and the BNY Mellon came from Kevin Fitzgerald, and his only connection was knowing Mr. Saman in jail. He remained in jail after Saman was out. Three weeks after Mr. Saman was released from Carver County Jail, Mamadou Cissé deposited a counterfeit Visy Inc. check into his bank account. And Mamadou Cissé looked at that check at trial and said, yeah, that's my signature. We had a picture of him putting in his bank account. He said, I don't remember where I got it or that account, but that's my check. So that's the Visy Inc. connection directly between Kevin Fitzgerald and Mamadou Cissé. Then if we go to... That happened in April, three weeks after Mr. Saman gets out of Carver County. Now we go to May of 2012. This is the chart that's at page 15 of my brief. Mr. Saman goes into TCF and Wells Fargo, opens like five different accounts in a five-day period, basically. Personal checking account and then some linked business accounts. And these are the checks that he either cashed or had in his pocket when he was arrested at TCF Bank. He had a check from... He had three checks that were... BNY Mellon, which is Kevin Fitzgerald's retirement provider's account. He had a check that was supposedly written by Westfall Auto Sales. And he had a check that was written by NDA Marketing. Those were the victim bank accounts. That same month, a week after Mr. Saman had those checks at Wells Fargo and TCF, Andrew Bates was arrested cashing NDA Marketing and Westfall Auto Sales checks at U.S. Bank. Andrew Bates' checks came from Mamadou Cissé. Andrew Bates was not related at all to Saddam Saman or Fester Sionkin. The other thing is these payees on the checks that Those were all doing business as companies that Mr. Saman had set up for purposes of this fraud. When we recovered the Kia in August that he was driving, those DBA Secretary of State documents were in there. He provided those documents to Wells Fargo and TCF when he opened the accounts. I'm doing business as Stop and Save and Garage Fuel. June, another month later, officers execute search warrant at Mamadou Cissé's apartment, and they recover his computer with VersaCheck check writing software on it. On that software, this is June 2012, Stop and Save, Garage Fuel, and Mr. Barbecue were all saved as payees in Cissé's computer. Vizzy Inc. was saved as a payor account in Cissé's computer in June. Andrew Bates was saved as a payee in Cissé's computer. And the timeframes all linked up with what was in the computer, the time dates for that? That's right. Actually, it was unclear how the VersaCheck software, exactly what it saved and frankly, when Mr. Cissé testified, he didn't really know exactly how the software would save or not save. But when officers recovered it on June 26, 2012, pretty much everything in there was recent. It was like from April and May and June of 2012, the payees and the information that was in it. And Cissé didn't know if, I mean, he admitted he had been using the software for years, different versions. He didn't know if things got overwritten or what. But basically, everything that was in the VersaCheck that we recovered had been saved within the last couple of months prior to us recovering it in June. So there's no evidence. I mean, we had checks in this conspiracy going back to 2009. Vizzy Inc. did not come on the scene until Saddam Saman was re-saw. The only evidence of Saddam Saman actually doing checks, other than just talking about it with Fester Sayankin, were directly linked to Mamadou Cissé. Cissé himself is cashing a Vizzy Inc. check. So really what the defendants are, you know, the appellants are hanging their hat on is Cissé and Saman didn't know each other. The government couldn't prove they knew each other. Therefore, there had to be two conspiracies, the Saman Sayankin and the Cissé. That's conspiracy 101, that all of the conspirators don't have to know each other. They just have to know that they're signing up to do checks, you know, or do whatever the conspiracy or the scheme is. And if you look at what Judge Montgomery said, she said, well, you know, was it the same means or the same method of doing things? I mean, they were stealing victim bank accounts and counter, you know, and putting false signatures on those and cashing them at banks. They were using runners. It was all the same. What do you think the standard is for when this instruction should be given? How's a district judge supposed to decide when to give this instruction? Single, multiple conspiracy instruction. I think that the court should give it when there's evidence that indicates that there are two conspiracies. What do you mean that indicates? Present. When there's evidence that could allow a reasonable jury to find that there's two conspiracies. You want to concede that? Well, I think even though the court... If we conclude that a reasonable jury could have found two conspiracies here, then it was error not to give the instruction? No, Your Honor. I'm saying that... That's what you just said. The judge is supposed to give it if a jury could infer that there were two. Just because the judge possibly should give it doesn't mean that it's error for the judge not to give it. I think what you're trying to say is that the judge has discretion. And when they look at the evidence that's sitting in front of it, isn't the question we ask as a district judge always the same? And that is, does this fairly raise the question? And if you perceive the question as having been fairly raised and the evidence being in such a way that reasonable jurors can reach that conclusion as an act of discretion, you may elect to give it. Or you might look at that same evidence and you say, gosh, I'm not quite sure it's there. And exercise your discretion and say, I'm not giving it. And this looks like that was one of those cases where it wobbled on the edge. The judge's answer was, I'm not giving the instruction, but you're free to argue it. Now, they argued it, and all of a sudden they get a question. That's when, as a trial judge, all of a sudden all the bells and whistles are going off in your brain and saying, now what do I do? Do I give the multiple conspiracies instruction? Or do I just say, you have the instructions? Or do I say, I want you to go back and look at the charged instruction in the indictment. If you look at the charged conspiracy in the indictment, that will explain it. Now, in this case, Judge Montgomery elected to say, you have the law that you have. Now, the question that I've having made that election, why is that not an abuse of discretion in light of the question? Do you get what I'm saying? I get what you're saying, Your Honor. First of all, I think that us trying to interpret what a jury is struggling with by a question, that's a difficult exercise. It is, but we read the tea leaves all the time. That's the whole trial world. When the question comes, you've got to read the tea leaves one way or the other. And I understand that there's a school of thought among some judges is that we try not to answer any of the questions that say, you have the law you have. There are other judges, and I was one of those. I was more inclined to answer the questions. But I think that's a discretionary thing. And I think in the great big bell curve, the judge has the choice. So the question for me, at least personally, and I don't know what anyone else is going to think, but it becomes like, is this question so pointed that you had to address sort of the elephant in the room? And you obviously think not. So I want you to tell me why not. I don't think so, Your Honor, because another interpretation of that question is, do the jurors really understand that the conspirators don't all have to know each other? Well, they should, because we told them that. Well, again, the jury's maybe wondering, do I have to connect Saddam Samman to Charles Dean or Picasso de to Mr. Sionkin, right? But giving the multiple conspiracies instruction wouldn't solve that problem. If that was their question, do all these conspirators have to know each other? That's not going to be answered either way with the multiple conspiracies instruction. Do you suppose district judges sometimes send the juries back to the original instructions because they're concerned the juries may not have studied them carefully enough and really the answer that's there? Absolutely. I feel like I've personally observed that many times, Your Honor. But I also do want to note that even if the court should have given this instruction, even if, which I absolutely just don't think there was any evidence to support the court, the notion that there were multiple conspiracies. But even if the court should have given that instruction, there was no error by not giving that instruction because the evidence was so strong about this being one unified conspiracy. I don't understand that. Even if the court should have given the instruction, there's no error in not giving the instruction? That's right. What does it mean to say the court should have given it then if it's not an error not to give it? Well, Your Honor, I believe the standard is that the court looks at was it... Was the charge as a whole, right? I'm sorry. Well, no. Even if you could say the court, yeah, maybe the court should have given this multiple conspiracies instruction. If it didn't cause prejudice, there's no error unless there's a harmless error argument now. That even if it were error not to give it, there was no, it was harmless error because there was no prejudice. Is that what you mean? Yes, Your Honor. Because don't we first look at, we look at, we look at the first picture is the charge as a whole, a fair and accurate statement of the law. And if you say, well, it kind is, but it didn't answer the multiple conspiracies argument. Well, that's an error. And now the question is, it's got to become harmless at that point or we've got to fix it, right? Did I miss something? Right, Your Honor. And, and there's no, and there is, there's no harm that would have resulted from it. Again, there, there was no basis to give this instruction. If Mr. Simon participated in this conspiracy at all, it was with the help of Mr. Cisse, which we have direct evidence of, but... You know, our cases seem to say if there's a single multiple conspiracy, then it's not error to decline the instruction. That's different from saying if there's sufficient evidence to support single multiple, then the court is supposed to give the instruction, which is I think the position you started out with. But I think the case law is actually even less helpful, the defense than that. I don't know whether it's for the rule, but that's what the Roach case says. And Your Honor, I may have gotten confused or misspoken, but I think what I'm trying to say is the court could have given that if the court felt like there was evidence to support the multiple conspiracies instruction. Could have, right? The question is whether it was required to. I don't believe the court was required to in any case, but certainly not in this case. You want to address any other issues in your last 245? I do have a question, if I could, on another issue, unless you wanted to address something that the defense attorneys did. And I will. The section, the 1028 Big A Identity Theft. What is the evidence? It seems like there's multiple concerns from the defendant on that conviction. The issue of live or deceased, but also what about the knowing aspect of it? What evidence did the government present to show that the defendant knew that that identity was of a that I think is sort of implicit throughout Mr. Simon's conduct, is that when you go to a bank and you open an account, you give them, you know, they want your information, they want name, they want social security number, etc. And so presumably Mr. Simon knows that you can't just walk into a bank and make up a social security number and get a series of several accounts with a made up number. So presumably he's using that. Is that because the bank, was there evidence that the bank would check as to whether that was a legitimate number? Your Honor, I think the evidence that the bank would check is implicit in when you open up a bank account at an FDIC insured institution. But beyond that, when Mr. Simon, when we recovered the Kia from that Mr. Simon was driving in August of since he was released in March. Among the other documents we recovered was an alien registration card that appears to be, and the jury saw this, but appears to be a real alien registration card in the name of the victim of the identity theft with this picture on it. And also a social security card in the name of the victim with a social security number that Mr. Simon had used. But these are real, you know, these are real documents that he had. But it seems like there's all sorts of times when people make false documents just like the ones you've described so that they look real. Here I've got you an alien card with a photo and I've got you the social security card with a number and put those together and that's going to look really good. I'm just, I just was questioning whether there was much in there to show the knowledge on the part of the defendant. But the documents that were recovered, Your Honor, the alien registration card had a picture on it. It wasn't Simon. It was someone else's ID card. So Simon had gotten a fake Minnesota ID card that had that same information on it. Well, it had the date of birth and name of the victim with Simon's picture on it. So he took, presumably, a real alien registration card, real social security card, and used that information. It's not like he had one made for him that was fake, the alien registration card with his picture on it. It wasn't his this Figueroa case where the court, that was where the court determined, you have to know it's a real person, right? You're saying the card that was seized showed the picture of a different person? Yes, the alien registration card that he had. What document had the defendant's picture? A fake Minnesota ID card that he had gotten in the victim's name. So he had two cards, one with the other guy's picture and one with his picture? Yeah, in his wallet was the fake ID. In the vehicle was what appears to be a real social security card and alien registration card that matches the A-file that we obtained from the Department of Homeland Security, and the jury also saw that. And that's how you argued the case to the jury? Yeah. But Mr. Simon didn't have the A-file, obviously, when he was committing this in 1982. But in the Figueroa case, the person was an undocumented person who was working without and using someone else's social security number. And he argued, I just bought this number from someone. I didn't know this was a real number. And you can see it in that instance where if you're just buying a series of numbers from someone, maybe you don't know that it belongs to someone. But not when you have their alien registration card and social security card in your possession. Thank you, Your Honors. Very well. Thank you for your argument. The case is submitted and the court will file an opinion in due course. Thank you to all counsel.